DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Defendant-Appellant Jonathan T. Clark has appealed from his conviction in the Summit County Court of Common Pleas of felonious assault. This Court affirms.
 I {¶ 2} Defendant-Appellant Jonathan T. Clark was indicted in September 2005 on one count of felonious assault, in violation of R.C. 2903.11(A)(1), a felony of the second degree; one count of robbery, in violation of R.C. 2911.02(A)(2), a felony of the second degree; one count of obstructing official business, in violation of R.C. 2921.31(A), a misdemeanor of the second degree; and one count of resisting arrest, in violation of R.C.2921.33(A), a misdemeanor of the second degree. The case was tried to a jury on January 31, 2006. On February 1, 2006 the jury found Appellant guilty of felonious assault, obstructing official business, and resisting arrest. Subsequently, Appellant was sentenced to three years in prison on the felonious assault conviction.
 {¶ 3} Appellant has timely appealed, asserting three assignments of error. Appellant's first and second assignments of error have been consolidated to facilitate our review.
 II Assignment of Error Number One
"APPELLANT'S CONVICTION OF FELONIOUS ASSAULT WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE."
 Assignment of Error Number Two
"THE TRIAL COURT ERRED IN FAILING TO GRANT APPELLANT'S CRIMINAL RULE 29 MOTION TO DISMISS THE FELONIOUS ASSAULT CHARGE FOLLOWING THE CONCLUSION OF THE CASE."
 {¶ 4} In his first and second assignments of error, Appellant has argued that the State produced insufficient evidence to support his conviction and that his conviction was against the manifest weight of the evidence. We disagree.
 {¶ 5} A Crim.R. 29 motion tests the sufficiency of the evidence. Crim.R. 29(A) provides that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." Id., citing State v. Thompkins (1997), 78 Ohio St.3d 380, 390
(Cook, J., concurring). In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. State v. Jenks (1991),61 Ohio St.3d 259, 279. Furthermore:
"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus; see, also,Thompkins, 78 Ohio St.3d at 386.
In State v. Roberts, this Court explained:
"[S]ufficiency is required to take a case to the jury[.] * * * Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *4. (Emphasis omitted).
Accordingly, we address Appellant's challenge to the weight of the evidence first, as it is dispositive of his claim of sufficiency.
 {¶ 6} In determining whether a conviction is against the manifest weight of the evidence an appellate court:
"[M]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339,340.
A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. Thompkins, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. An appellate court must make every reasonable presumption in favor of the judgment and findings of fact of the trial court. Karchesv. Cincinnati (1988), 38 Ohio St.3d 12, 19. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175; see, also, Otten,33 Ohio App.3d at 340.
 {¶ 7} Appellant was convicted of felonious assault, in violation of R.C. 2903.11(A) which provides, in pertinent part, that "[n]o person shall knowingly * * * [c]ause serious physical harm to another[.]"
 {¶ 8} Officer James Donohue of the Akron Police Department ("APD") testified to the following. On September 28, 2005, he responded to a robbery with a gun call. As a result of the information gathered at that scene, he proceeded to 740 Aberdeen Street in Akron to look for Appellant. Officer Donohue and two other APD officers conducted surveillance on the residence. Officer Donohue observed Appellant walking away from the house rapidly. Appellant began to run when ordered to stop by Officer Donohue. After a foot chase, APD officers finally subdued Appellant by force. Officer Donohue testified that Appellant resisted, struggled, refused to give his hands and tried to stand up. The officers used a Taser on Appellant. The officers called for EMS because Appellant complained that he was injured. While awaiting treatment at the hospital, Appellant told the officers that he had run because "he hit a white guy." Appellant stated that a "white guy" had come to his door at 740 Aberdeen saying he was from the mortgage company. Appellant admitted that he "knocked his ass out."
 {¶ 9} On cross examination, Officer Donohue testified to the following. He investigated Appellant's house and found no sign of forced entry. It appeared from his investigation that someone was living at the residence.
 {¶ 10} Richard Tharpe, a home inspector, testified that he began inspecting the property at 740 Aberdeen in January 2004 at the request of the mortgage company. Initially, he was required to stop and tell the individual living there to call the mortgage company. At a later date it became a "verify occupancy" job and in March 2005, the job was elevated to a walk-through inspection. Beginning in March 2005 through September 2005, Mr. Tharpe received requests to perform a walk-through of 740 Aberdeen Street. Prior to this incident, the house had never been occupied.
 {¶ 11} On September 28, 2005, Mr. Tharpe conducted an inspection of the property. He noticed a new electric meter on the house which raised a concern as to the occupancy of the house. He approached the house and knocked on the side door as was his custom. When there was no answer, he used his key to let himself in. Mr. Tharpe testified that upon entering, he was standing on a landing, with steps leading down to the basement, and steps leading up to the kitchen area. The door leading into the kitchen was closed. Mr. Tharpe testified that he yelled to see if anyone was home.
 {¶ 12} Mr. Tharpe testified that Appellant immediately questioned his presence in the house. Mr. Tharpe apologized and attempted to explain why he was in the house. Appellant commanded Mr. Tharpe not to move as he had to "show [Mr. Tharpe] some papers" to demonstrate that Appellant had "been corresponding with Countrywide Mortgage" and that Mr. Tharpe had no reason to be in his house. At no point did Mr. Tharpe tell Appellant that Appellant was not supposed to be there, nor did he ever ask Appellant to leave. Mr. Tharpe testified that his main objective at that point was to leave the property without bothering Appellant.
 {¶ 13} Mr. Tharpe testified that when he turned his back on Appellant and exited the home Appellant hit him in the side of the head. Mr. Tharpe tried to reason with Appellant as he was walking away, but Appellant hit him again and Mr. Tharpe lost his balance, fell down an embankment, and hit his shoulder. Mr. Tharpe, who at this point was suffering from a dislocated left shoulder and a fractured humerus, pleaded with Appellant to not hit him again.
 {¶ 14} Mr. Tharpe testified that he managed to get into his truck and drive down the street where he felt safe to call 911. An ambulance arrived on the scene and treated his injuries. The APD arrived shortly after the attack. Mr. Tharpe was transported to St. Thomas Hospital where he received treatment for his more serious injuries. Since the attack, Mr. Tharpe has been unable to work as a home inspector and missed a month of work. Mr. Tharpe also underwent two months of physical therapy. Mr. Tharpe testified that his fractured arm will take six months to fully heal.
 {¶ 15} Mr. Tharpe testified that he never threatened Appellant. He never attempted to force his way further into a home. He never ordered the Appellant to leave. He was never aggressive towards Appellant. He is still getting orders to inspect the property and has not had any problems since the assault.
 {¶ 16} On cross examination, Mr. Tharpe testified that at the time he inspected 740 Aberdeen he knew it was owned by Appellant because the paperwork indicated it. He testified that there was never a car in the garage on any day that he inspected the premises. He testified that he did not have a court order to inspect the property. He had a good idea that someone may be living in the home because the electricity had been turned on. Mr. Tharpe testified that Appellant stated that he had changed the locks. Mr. Tharpe testified that he used his key in the door and it still fit the lock. He explained that with quick set locks, keys will often fit but just will not unlock the door. However, he did not know that the locks had been changed or that the door was unlocked, so he believed his key was unlocking the door. Mr. Tharpe testified that he was not invited into the house and that when Appellant demanded identification, he told him he represented Countrywide Mortgage.
 {¶ 17} Officer Clayton Cozart of the APD testified as follows. He responded to 740 Aberdeen on September 28, 2005. Mr. Tharpe was very upset and in obvious pain. Mr. Tharpe told him what happened and indicated that he was frightened. After speaking with Mr. Tharpe, Officer Cozart immediately returned to the house to speak with Appellant. In his experience, many of the homes in the area are vacant. He knocked and announced and nobody answered. He was unable to find any witnesses. Later that evening, Officer Cozart heard a call go out in the same area that matched the description of his suspect. He notified the officers of the assault to which he had responded. Officer Cozart testified that he was unaware of anybody coming forward claiming to be a witness. On cross examination, Officer Cozart testified that he had never spoken to Appellant.
 {¶ 18} Appellant presented the testimony of Laron Sledge-Bey and also testified on his own behalf. Mr. Sledge-Bay, Appellant's neighbor, testified to the following. Appellant continually lived at 740 Aberdeen for a maximum of two years. On September 28, 2005, Mr. Sledge-Bey testified that he observed Mr. Tharpe walk around Appellant's house, approach the side door, and enter without knocking. Approximately one minute later, he heard Appellant yelling at Mr. Tharpe to "get the f____ out of my house." He observed Mr. Tharpe attempt to talk with Appellant. Appellant responded by knocking Mr. Tharpe's hands away, pushing him out the door and taking three or four swings at Mr. Tharpe, none of which connected. Mr. Tharpe then fell down. Appellant stood over Mr. Tharpe and continued yelling at him.
 {¶ 19} Mr. Sledge-Bey testified that Mr. Tharpe stood up and attempted to talk to Appellant. At that point, Appellant started swinging again, but continued to miss with his blows. Mr. Tharpe then ran, missed a step and fell onto the sidewalk. Mr. Tharpe then ran across the street. Appellant was wearing jean shorts with no shirt. Mr. Tharpe waited until Appellant went back inside the house and then walked over to his truck, got in, and circled the block twice. Mr. Sledge-Bey testified that he related to Officer Cozart what he had seen.
 {¶ 20} On cross-examination, Mr. Sledge-Bey testified that he never contacted the police or filled out a police report. He testified that he was approximately 200 feet away from the altercation. He repeated that he could see that Mr. Tharpe did not have a key.
 {¶ 21} Appellant testified to the following. He has owned the property at 740 Aberdeen since 1999 and has not always lived there. Countrywide maintains the mortgage and the property is in foreclosure. Appellant moved into the house in August 2005. He changed the locks on the doors in June 2005. On September 28, 2005, he was cooking some eggs in his underwear when he heard a "boom." He heard a second "boom" and a second door to the kitchen flew open and hit his right ankle, fracturing it. When he turned, he saw "a huge white man" lying at the top of the steps.
 {¶ 22} When Appellant asked the man who he was, the intruder (Mr. Tharpe) told Appellant that he was trespassing. Appellant testified that he was a gentleman and offered to show Mr. Tharpe his proof of ownership. Appellant testified that Mr. Tharpe looked like he was drunk and smelled of alcohol. Appellant produced the appropriate paperwork, showed it to Mr. Tharpe, who read it and agreed that Appellant was the owner. Appellant asked Mr. Tharpe how he got in and for identification. Mr. Tharpe stated that he had a key. However, when they tried the key in the lock it did not fit.
 {¶ 23} Appellant testified that at this point, he became irritated and again requested identification. Mr. Tharpe refused to comply. Appellant then attempted to restrain Mr. Tharpe until the police arrived. Mr. Tharpe ran out the door and fell. Mr. Tharpe got up and ran towards the front of the house. Appellant stopped and procured his shorts and by the time he got outside, Mr. Tharpe had fallen down the steps and was lying on the sidewalk. Appellant watched Mr. Tharpe get up, run to his truck and drive off. Mr. Tharpe did not appear to have anything wrong with him. At that point, Appellant got dressed and left to find his son.
 {¶ 24} When he returned, he found that his house had been "ransacked." The door had been kicked in, the kitchen cabinets had been pilfered and the upstairs was in disarray. Appellant knew the police were responsible. Appellant testified that "Ron" (presumably Laron Sledge-Bey) told him that the police knocked on the door and then entered the house.
 {¶ 25} Appellant then testified that at approximately eight o'clock p.m., he was lying down and he heard somebody else kick his door in. He looked up and saw a man named Anthony Sanders standing next to his bed. Anthony told him that the police were outside to take him to jail. Appellant put on his pants and went outside to talk to the police. However, there was nobody there. At that moment, Anthony ran by him holding Appellant's laptop computer under his arm like a football and knocked him down. Despites his fractured ankle, Appellant chased Anthony down the street. Appellant testified that Anthony "ran out of gas" and simply gave Appellant his computer back. Appellant threatened to "do something" to Anthony, but decided against it because Anthony had returned his computer peacefully.
 {¶ 26} Appellant testified that at this point, he had had a bad day and didn't feel safe at home, so he decided to take his laptop and wait at his cousin's house for his son to get off of work. Appellant testified that he had to gather his things because the police had "tore up" his house. At that point, Appellant's girlfriend, Tina, told him that:
"[T]he police are all over North Hill looking for you. They told me to tell when they catch your Chicago ass that they going to kick your mother f____ing ass for hitting a white man in this G____ damned town and they going to show you what it's like to hit a white man in this G____ damned town."
 {¶ 27} At this point in his testimony, Appellant's counsel attempted to interject numerous times. However, unimpeded, Appellant continued to testify. He testified that he walked out the door and that the street light was out. Appellant testified that the police were waiting for him. Appellant testified that he thought the police were going to shoot him for hitting a white man. Appellant testified that the police officer had his gun drawn and trained on him and that Appellant began yelling to wake people up. Appellant wanted to alert his neighbors so they could act as witnesses because he knew the police were going to shoot him because "word was out that I hit a white man in this town."
 {¶ 28} Appellant testified that he ran out into the streetlight and lay down on the sidewalk. At that point, the officer jumped on him and hit him repeatedly. The officer then stunned him with a Taser. Appellant then testified that "[i]f you Taser and you shoot a cow, do you know what that cow does? It freezes. It falls down." After a rebuke by his counsel, Appellant continued his testimony. According to Appellant, he willingly gave the officers his hands and did not resist. Even though he was complying, the police continued to beat him.
 {¶ 29} Appellant testified that he was taken to St. Thomas hospital and received treatment for his injuries. At St. Thomas he was questioned by the police, not about any of the matters which had occurred, but about how to file bankruptcy and how he was able to procure all of his properties. The police took Appellant from St. Thomas to the Akron Police Station. Appellant was under the influence of pain medication and his memory was "scrambled" when the police shot him in the head with the Taser. Appellant testified that his mind was still not functioning properly.
 {¶ 30} On cross-examination, Appellant testified to the following. Appellant had not made a payment on the property at 740 Aberdeen since 2001. He testified that he lay down on the ground willingly and did not have to be tackled. Appellant admitted that he had told the ER physician that his ankle pain was from a break he sustained in Chicago. However, Appellant testified that he must have "refractured" it. Appellant testified that he was "just joking" about the Taser's affect on his mind and that he really did not know what the long term effects of being shot with a Taser were.
 {¶ 31} Appellant denied telling Officer Donohue that he had assaulted a white man who worked for the mortgage company, but that did not show him identification. Appellant testified that he told Officer Donohue that he "should have" knocked him out, not that he did knock him out. Appellant admitted that he ran from the police.
 {¶ 32} On re-direct examination, Appellant testified that he never punched at Mr. Tharpe, but was attempting to restrain him. Further, he was nowhere near Mr. Tharpe when he fell down.
 {¶ 33} On re-cross examination, Appellant testified that he was trying to restrain Mr. Tharpe because he thought Mr. Tharpe had a gun. Appellant testified that Mr. Tharpe had a "flashing thing" and that he probably dropped it when he fell. Appellant also testified that he attempted to restrain Mr. Tharpe for the police, but never actually contacted the police.
 {¶ 34} After careful review of the entire record, weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, this Court cannot conclude that the jury clearly lost its way when it found Appellant guilty of felonious assault. This Court finds that the testimony of Mr. Tharpe and the State's other witnesses was consistent and credible. The testimony offered by Appellant was riddled with inconsistencies. Moreover, Appellant's testimony was both convoluted and outlandish.
 {¶ 35} The jury was in the best position to evaluate the credibility of witnesses and give proper weight to their testimony. See State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Appellant's conviction was not against the manifest weight because the jury chose to believe the testimony of the State's witnesses over that of Appellant and Mr. Sledge-Bey. State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at *2. Furthermore, as previously stated, "a determination that [a] conviction is supported by the weight of the evidence [is] also * * * dispositive of the issue of sufficiency." Roberts, supra at *4. Accordingly, having found that Appellant's convictions were not against the manifest weight of the evidence, this Court need not discuss further his challenge to the sufficiency of the evidence. Accordingly, we find that Appellant's first and second assignments of error are without merit.
 Assignment of Error Number Three
"WHETHER TRIAL COUNSEL'S REPRESENTATION WAS DEFICIENT AND AFFECTED THE OUTCOME OF THE CASE."
 {¶ 36} In his third assignment of error, Appellant has argued that trial counsel's failure to make a Crim.R. 29 motion at the close of State's evidence was ineffective assistance of counsel. We disagree.
 {¶ 37} According to the record, at the close of all evidence, the trial court dismissed the jury and had a discussion with counsel. During that discussion, the trial court referenced a sidebar conducted after the State had rested, at which time Appellant's trial counsel made a timely Crim.R. 29 motion. The trial court denied that motion. While the sidebar was off the record and thus not included in the transcript, according to the trial court the motion was timely made. Therefore, Appellant's third assignment of error is without merit.
 III {¶ 38} Appellant's three assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Slaby, P.J. Carr, J. concur.